## SMALL-LYNCH CO. v. MIDWEST & GULF CO. OF TEXAS TRUST ESTATE. (No. 10818.)

(Court of Civil Appeals of Texas. Fort Worth. Nov. 8, 1924. Rehearing Granted Dec. 20, 1924. Further Rehearing Overruled Jan. 24, 1925.)

1. **Mines and minerals ⊗⇒78(7)—Evidence held to sustain finding that due diligence in operation of oil lease had not been exercised.**

   Evidence *held* to sustain finding that due diligence in operation of oil lease had not been exercised.

2. **Appeal and error ⊗⇒1036(6)—Permitting judgment creditor of defendant to intervene in action to forfeit contract for operation of oil lease, if error, held harmless.**

   In action to forfeit contract for operation of oil lease, error, if any, in permitting a judgment creditor of defendant to intervene, and in awarding to such intervener a judgment for the amount of his debt, interest, and attorney's fees, *held* harmless so far as the controversy between plaintiff and defendant was concerned.

3. **Mines and minerals ⊗⇒79(1)—Company operating lease under contract entitling it to one-half of production held not liable for rentals accruing to owner.**

   Though assignee of oil lease is ordinarily liable for rentals due thereon to owner thereof, even though such liability is not specifically assumed, assignee of interest in the production of a lease under contract which amounted to a contract of operation rather than assignment *held* not liable for rentals accruing.

4. **Appeal and error ⊗⇒230—Trial ⊗⇒352(1)—Form of special issue submitted held not misleading or prejudicial; "due diligence"; "reasonable diligence."**

   In action to forfeit contract for operation of oil lease, submission of issue, "By the use of reasonable diligence what amount of oil could such lease now produce? * * * *"—which had word "reasonable" stricken and word "due" written above it in manner that both were shown, *held* not misleading, since words in sense used are synonymous and in any event

not reversible error in absence of timely objection.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Due Diligence; Reasonable Diligence.]

### On Motion for Rehearing.

**5. Contracts ☞318—Forfeiture not favored and will not be enforced, unless clear intent to provide for it is shown.**

Forfeiture is not favored in law or equity, and will not be enforced, save on the clearest evidence that parties intended to provide for it.

**6. Mines and minerals ☞109—Company having contract for operation of lease held not chargeable with negligence of its receiver.**

Company having contract for operation of oil lease entitled to receive one-half of production *held* not chargeable with negligence of receiver appointed over it in operation of such lease.

**7. Mines and minerals ☞109—Negligence of manager of company having contract for operation of oil lease held not grounds for forfeiture of contract.**

Where members of company having contract for operation of oil lease disapproved of negligent manner of operation by their manager, and took steps to relieve him of his duties, *held* his negligence was not grounds for forfeiture of company's contract, though grounds for action for damages.

Buck, J., dissenting in part.

Appeal from District Court, Clay County; H. R. Wilson, Judge.

Action by the Midwest & Gulf Company of Texas Trust Estate against the Small-Lynch Company, wherein J. W. Green intervened. Judgment for plaintiff against defendant, Lewis Ikard, receiver, and intervener, and for intervener against defendant and Lewis Ikard, and defendant appeals. Reversed and remanded.

Wantland, Dickey & Glasgow, of Henrietta, for appellant.

Stine & Stine and W. G. Eustis, all of Henrietta, for appellee.

BUCK, J. ·The Midwest & Gulf Company of Texas Trust Estate, domiciled at Wichita Falls, acting by and through its trustee, W. P. Weichel, on October 15, 1920, made a contract with the Small-Lynch Company, a joint-stock association with its domicile in Clay county; the latter acting through its president, B. C. Small, and its secretary, J. S. Dickey. By the terms of said contract, the Midwest & Gulf Company Trust Estate, hereinafter called plaintiff, conveyed to the Small-Lynch Company, hereinafter called defendant, a one-half interest in the lease of a tract of 35 acres out of block 4, Parker county school lands, situated in Clay county, "together with nine oil wells, all of which were formerly producing wells, but are now not on pump." By the terms of said contract, the defendant agreed "to take over said property, to clean out each and all of said wells and to place them on pump, and to furnish all necessary power at its own expense, and to deliver into storage tanks seven-sixteenths (7/16) of all oil for the credit of party of the first part, free of all expense to said first party, and to continue so to do so long as oil in paying quantities may be produced therefrom." Second party further agreed that:

"As soon as said nine wells above described have been put on the pump, to drill additional wells on said property at such times and in such locations on the lease that may be mutually agreed upon by the parties hereto, and for all such additional wells so drilled, the expense of drilling shall be borne equally between the parties hereto, one-half (½) to each, and any and all production obtained therefrom shall be divided equally between the parties hereto, each receiving seven-sixteenths (7/16) thereof, and in the event that sufficient proceeds or funds from oil produced from said above-described nine wells shall be sufficient to drill an additional well or wells, then it shall be mandatory on party of the second part to continue to drill said additional wells so long as there are sufficient funds so to do, or until said lease be fully developed. * * * Said second party agrees to begin active operations for the development of this property within five days from the date of signing hereof, and to continue to prosecute said development actively and with due diligence and dispatch until said lease be fully developed, and in the event that said second party should fail to carry out the covenants and agreements herein contained and stipulated, then and in that event this instrument shall become null and void, and said property is to forthwith revert back to said first party."

In compliance with this contract, the Small-Lynch Company, a trust estate composed of B. C. Small, W. J. Lynch, Frank Moore, Frank Neville, and J. S. Dickey, went upon the premises assigned within five days and proceeded to clean out the wells. On October 7, 1922, the Midwest & Gulf Company filed suit against the Small-Lynch Company in form of trespass to try title of the land in controversy. In a second count in its petition, the plaintiff alleged that it had acquired a lease on the land in question on August 18, 1919, from W. S. Sewell, who was the owner of the fee-simple title, and that Sewell executed a lease to plaintiff of the land for a period of 10 years from date; said lease providing that the lessor should get one-eighth royalty from all oil taken from said premises, and providing for payment of a certain sum for each gas well, and further provided:

"That if no well be commenced on said lands on or before the 18th day of August, 1920, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, * * * the sum

of $350.00, which shall operate as a rental and cover the privilege of deferring the commencement of a well for 12 months from said date. In like manner and upon like payments, or tenders, the commencement of a well may be further deferred for a like period of the same number of months· successively."

It was further alleged in plaintiff's petition that the plaintiff had assigned an undivided one-half interest. in and to its leasehold estate to the Small-Lynch Company, and that it was agreed by said Small-Lynch Company that it should take over said property and clean out each well then on said lease and put the same on the pump for the production of oil, and to furnish all necessary power at its own expense, and to deliver into storage tanks seven-sixteenths of all oil produced from said lease to the credit of plaintiff.

It was further alleged that at the time of said contract there were nine wells on said lease, and the defendant agreed that, as soon as said nine wells were put on the pump, to drill additional wells on said lease at such times and at such locations on the lease as might be mutually agreed upon by said parties; each party to the contract bearing one-half of the expense of such drilling.

It was further alleged that by the terms of this contract between the plaintiff and Sewell, in order to defer the necessity of drilling a well on said land, the plaintiff was required to pay to said Sewell a rental of $350 per annum, in order to avoid a forfeiture of the lease, and that plaintiff did pay said rental, and "whereas, an undivided one-half interest having been assigned to said defendant, defendant was bound to pay one-half of said rentals, above specified under said contract." That plaintiff paid the rental due on August 18, 1921, to said Sewell, but that, though often requested to pay its one-half of said rental, the defendant failed and refused to pay any part thereof. That the defendant had never complied with that part of its contract with plaintiff to begin the drilling of a well on said lease, "though plaintiff was anxious, ready, able and willing to pay its part of the expenses of drilling additional wells and often requested defendant, Small-Lynch Company, to do so, and before the times said rentals were due, but defendant wholly failed to do so, which said failure necessitated the payments of the rentals as above stated."

Plaintiff further alleged that defendant did not commence active operations for the development of said lease within five days from the date of the lease, to wit, October 15, 1920, and did not operate said wells or develop said lease with due diligence and dispatch as it had agreed to do, but wholly made default therein, and that it never had cleaned out three of said wells or put them on the pump. Plaintiff further alleged that

defendant had not furnished sufficient power as it had agreed to do to develop said lease and to produce oil therefrom, and that at the time of the filing of plaintiff's amended petition it had no power at all on said lease. Plaintiff further alleged that defendant had moved the machinery off the lease, "and are not pumping the wells on said lease, and have not since February, 1922, and no longer clean out the wells, and have exercised no authority or ownership over said lease and wells but have. wholly abandoned the same with the intention not to return or resume operations."

The defendant answered by way of a general demurrer and certain special exceptions, a plea of not guilty, and specially pleaded that the defendant was not liable for the payment of any rentals on said lands, denied that it had abandoned said lease or its undertaking to develop the same. Defendant specially pleaded that from the allegations of plaintiff's petition it appeared that plaintiff at the time of filing of the suit was the owner of the fee-simple title to the leased premises, and therefore could not recover under and by virtue of the agreement between W. L. Sewell and defendant, and specially denied that the defendant had agreed to pay any part of said rentals.

Lewis Ikard, the receiver of the Small-Lynch Company, theretofore appointed by the court, became a party defendant. J. W. Green, who had recovered in the county court a judgment against the Small-Lynch Company, intervened in said cause.

The cause was tried before a jury on special issues, and in answer to said issues the jury found: (1) That the defendant, Small-Lynch Company, did not use due diligence in cleaning out and putting the wells on the pump; (2) that the defendant did not put all the wells on the pump that would make or produce oil after the use of due diligence in cleaning out all wells on said lease; (3) that the defendant did not use due diligence in operating the wells on the land in question; (4) that the wells upon said lease did not produce oil enough over and above the reasonable cost of their own operation to drill another well or wells upon said land; (5) that, by the use of due diligence in operating the same, the lease would produce at the time of the trial 10 barrels a day; (6) that it would cost $6 per day to operate the lease in question with due diligence; (7) that the defendant did not abandon the lease; (8) that the defendant had begun within five days from the date of the assignment active operations for the development of the property described in plaintiff's petition; (9) that plaintiff notified the defendant by letter that it wanted to drill an additional well. The jury further found in favor of the claim of J. W. Green against the Small-Lynch Company for the sum of $224.15, interest and attorneys' fees.

Thereupon the court entered judgment for plaintiff against the defendant and Lewis Ikard, receiver, and against J. W. Green, intervener, for possession of the land. The judgment further canceled the assignment of the mineral lease between the plaintiff and the defendant. Judgment was given in favor of the intervener J. W. Green against the defendant and Lewis Ikard, as receiver, for the sum of $224.15, with interest, cost, and attorneys' fees.

The appellant's sixth assignment is as follows:

"That the jury erred in answering special issue No. 3 in the negative, which was this: 'Has the defendant Small-Lynch Company used due diligence in operating the wells on the land in question,' which said answer is in the face of both the law and the evidence."

W. P. Weichel testified for the plaintiff that, at the time of the execution of the contract and assignment between the plaintiff and the defendant:

"The lease, to all intents and purposes, had been abandoned by the former operators, and there was very little equipment of any kind on the lease at the time we entered into the contract. The wells needed cleaning out at the time the contract was made. There was not any power on the lease at the time we made this contract. The power is the power with which the wells are hooked up to, and it requires an engine to provide the motive power to pull that power. After the defendants got the assignment from us they cleaned out some of those wells—they cleaned out six of them and pumped them. I know that from my own knowledge acquired by visiting the lease. The other three wells on the lease have never been cleaned out. * * * The last oil run checks we received from this lease was for the oil run on the 26th and 27th of March, 1921, and my recollection is it was for $139 and some cents. * * * The last check we had received prior to that time was for the oil run in November, 1921 [?] The last time I was on this lease was the 7th of November last, [the trial being had about the middle of December, 1922]. * * * There was no one on the lease at that time, and it looked like it was almost in the same condition it was when I found it originally, when I first went on the lease. I found there was no power there, and the pull-rods, many of them, were down. I could not see any sign of where anybody had been working on the lease recently. I would think that under the terms of this contract those wells have produced oil in paying quantities. We received more money from the lease directly after the contract was made than we have received lately. Oil was higher at that time. The production was also materially more, shortly after making the contract, than it has been in the last few months. I do not know of my own knowledge when they last pumped any oil out there. The only evidence I have is from the run tickets. I learn from those that the last time the lease was pumped was some time in March, because there was no oil run since then. * * * I said that we paid rentals to Mr. Sewell in 1920, 1921, and 1922.

That is correct. I am not prepared to say when we first found out that Sewell claimed rentals. I think it was when the first rental was due in 1920. It is a fact that on the 17th of September, 1921, more than a year after the first rental was due, I wrote a letter to the Small-Lynch Company in which I stated: 'Our attention has been called to the rental clause in the lease covering the 35 acres in block 4, Tarrant county school land, by W. L. Sewell, from whom the lease was obtained. Mr. Sewell states the lease was subject to forfeiture on failure to pay rentals when due August 18, 1921. Our lease department construes the lease as being cured so far as rental is concerned as soon as oil was being produced on the property.' I wrote that letter. According to that letter it was not until 1921 that Sewell stated if the payment was not made on the 18th of August, 1921, he would forfeit the lease. We did not pay rentals on that lease before 1921. The reason Sewell wrote us that he was going to forfeit the lease if we didn't pay the rentals on the 18th of August, 1921, he would cancel the lease was because the rental was then due again. The rental was paid the year before. It may have been an oversight in writing that letter. We paid the rental on the recommendation of our land department. * * * We did not contemplate, at that time [the date of the assignment from the plaintiff to the defendant] that there would be any rental to pay. No demand had been made at that time for the payment of any rental at the time the contract with the Small-Lynch Company was made. That contract was made on the 15th of October, 1920.

"Q. And the rent-paying period was August 18, 1920, and you tell the jury you paid the rental on the 18th of August, 1920, yet you tell them on the 15th of August, 1920, no demand had ever been made and you hadn't paid any; now which statement is correct? A. There was no reason for making demand on October 15, 1920.

"Q. Which statement of yours is correct with reference to the payment of rentals? A. My first statement that rentals were paid, is true, in 1920, 1921, and 1922. I did not say that no demand was made by Sewell prior to October 15th. I said the rental was paid in 1920; I didn't say no demand was made. The only time I have been on this lease within the last year and a half was on the 7th of last month. I think maybe I spent a half or three-quarters of an hour there at that time. At the time the Small-Lynch Company took the lease I think there was one jack there on the well. At the time I was there on October 7th there were jacks on six of the wells. The rods were down at that time. At the time the lease was made there was no power house out there. There is what you might call a power house there now. It is a covering for something. * * * There never was any written agreement between us and the Small-Lynch Company to drill any additional wells. There was such a verbal agreement. That was the agreement I had with Mr. Small when we first talked over this contract, in fact, he was enthused over the possibilities of additional wells. I would say that was within a period of sixty days before the contract was made. I know that at that time the Small-Lynch Company was not existing. At the time this contract

was made I had no understanding as to whether or not rentals were to be paid Sewell. * * * There has not been any wells drilled on the contiguous or adjoining land, say within 400 yards of this lease, within that time, to my knowledge. * * * The last check we got was in payment for the oil run for the last half of March, 1922. I am not prepared to say when that check came in to us."

B. C. Small, testifying for the plaintiff, testified that he was an oil and water well driller, and operator for a spudder machine. That he had been in the oil fields nearly 30 years. That he had drilled a number of wells in the Petrolia field, and was familiar with that field. That there were nine wells on the lease when he went on there, and that there are nine wells there now. That he boarded close to this lease for three or four months the winter before the trial, but since that time he had been down in Henrietta most of the time. That the last time he saw the wells was in April of the year of the trial. That after the Small-Lynch Company got the half interest in the lease the witness was the one to manage in operating the field. That the wells had been abandoned four years at the time they went out there, and that they cleaned out six of the wells and put them on the pump. That they cleaned out two other wells and put them on the pump, but two of the wells were salt water. That they pumped one of them two weeks and the other three weeks and found that there was no oil in them, and they took them off the pump, leaving six wells on the pump. That the reason they did not put the ninth well on the pump was that it did not look very promising.

"And we left it until we got on the others and got them fixed, and never did go to it. But as far as the lease was concerned I think there was two jacks there when we went there, and we put everything else there and did all the work there was on it, and the six wells that were on the pump, I call them fairly good wells, for shallow wells. They were 253 and 260 feet deep. While we were pumping them it was hard to keep the wells pumping. Whenever you put that steam process in the wells you get the sand stirred up, and it is hard to keep them pumping. They would run from 10 to 15 barrels when they were all pumping. I know pretty well what it would cost to operate those wells after they were cleaned out. Your pumper would cost you about $100 per month, and it takes 8 to 10 gallons of gasoline a day to run the power and your other little incidentals, and every time you pull the rods it is $2 for pulling, and $3 for pulling the tubes, and that would have to be done every two weeks. I would say it would cost $6 or $7 a day to operate the lease. It would produce about 15 barrels a day. One man could operate 20 wells just as cheap as he could six. * * * About this steaming process, I thought I was the only man that ever heard of a thing like that, and I felt big about it, and I came down here and told this company. I was just as broke as I could be and wanted to try it on a

lease that had been abandoned for a long time to see what it would do. We went into these wells, they were just as dry as a floor, and we steamed them all six hours and the fluid rose 80 feet, and we put it on the pump, and it run 10 or 15 barrels. The wells were absolutely dry at the time we started. We didn't find but one well that had any fluid in it and two with salt water, but we steamed them just the same, and one of them we went back to the third time, and we figured we would go to work and put the other wells on the pump, and later on we would go back and get them on the pump. * * * I heard Mr. Weichel testify that only six of the wells had jacks on them. That is right, now. The reason all the wells haven't jacks on them is because they are pumping salt water. There is not much to it in putting jacks on salt water wells. When we went back to that third well, as a practical driller, it didn't look good, it was full of salt water. We put in the sucker rods in there and he lost his tools and it cost him $14. There was not a single well we didn't go into and try to operate. * * * When I left over there it was supposed one man could do the pumping as well as two, and Mr. Lynch stayed there and pumped the wells. There has never been any discussion by any member of the Small-Lynch Company with reference to abandoning this lease. I do not know of any intention to abandon it. After I was gone Mr. Lynch operated the lease for a while, and as soon as he quit he was succeeded by Mr. Hinkle, who operated under Lewis Ikard, the receiver."

Mr. Small further testified that while he was pumping the lease it made from 10 to 15 barrels a day. That he did not know that the lease ever cleared any money while they were there, as they had lots of expenses and only got one-half of the oil. That oil went down to $1 a barrel. It was $2.25 a barrel, then went down to $2, then to $1.50, and then $1. That after the oil went down to $1 a barrel and defendants were not getting anything, he left the lease, but Mr. Lynch stayed there and pumped the wells. That, when he was pumping, the average production of all the wells was about 10 barrels a day.

I. B. Hinkle testified that he, under the receiver, took the contract to pump the oil on this lease. That there were six wells on that lease at the time that were producing oil, and three were not. That he made only one oil run from that lease. That he was getting seven-sixteenths of the oil for his part. That he knew that in operating the lease the Small-Lynch Company had incurred some indebtedness, and that there was a suit in court and the judge had appointed a receiver. He made a contract with Lewis Ikard, and not with the Small-Lynch Company, and that his contract provided that he was to furnish all the oil and gasoline necessary to operate the lease. That it was true, in spite of the contract, the defendant agreed to and did furnish gasoline

to start the pumping, which cost about $22. That the defendant voluntarily agreed with him and did put up the money to have the rods pulled and cleaned, and furnished the gasoline to start him off. That he used oil on the lease. That the engine was rented and he understood that the owner was preparing to take it off the lease. That he did not notify Mr. Ikard, the receiver, or any member of the Small-Lynch Company about the prospective removal of the engine, or that he was going to quit. That the lease had gotten down to where it was producing about 5 or 6 barrels a day. He further testified:

"When I stopped I didn't notify anybody, only talked to Mr. Ikard about it. I talked to him about it, and what I was wanting to do was clean the wells out. I did not tell him I was quitting the lease. I just wanted to wait until I saw what was done about the engine. When I was out there about a month ago the engine and power was still out there. I think this company knows that I am not working out there now. In a way I have discussed it with the receiver and Mr. Dickey. I wanted to get in with them to drill some more wells or clean those wells out. I believed we could make a paying lease out of it, and it looked like we never could get together, and the gasoline went up and crude oil went down, and I didn't know what to do with it. I just thought maybe we could get together some time or other. I don't know as I ever told them I was not pumping the wells, but we talked it over what to do, and I told them the lease wasn't making anything, and I would put a rig on it and see what we could do. Those wells, if properly operated, would make good. * * * They never did promise me they would put another engine out there. There wasn't anything said about that, but King was going to move the engine the next week before I stopped, and of course I had heard of it, and I didn't think it was necessary to go any further with it and to go to the expense of pulling the wells and putting them in shape and then be without an engine. I talked with Mr. Ikard about putting another engine out there. He did not tell me they were going to take that engine away. I got that through the court and Mr. King, he was going to move it the next week. * * * I have had experience with other wells in that field of the same depth of those wells, within half a mile of them. They all seem to be about the same depth, and most all of them produce some salt water. A well that hasn't been used for some time and is put on the pump will sometimes produce salt water for a number of days and then produce oil. Sometimes it will pump probably a week salt water and then the oil will come and it will then change back again to salt water. * * * I was over there last something like a month ago. At that time there were two 100 barrel tanks on the lease. Those tanks, the pullrods, the engine house, jacks and everything for the development of the lease are still there. The lease don't show any sign of abandonment. It does cost a great deal of money to equip a lease. * * * I talked to Mr. Ikard about King telling me he was going

to get the engine. Mr. Ikard talked about the engine, and said it didn't belong to them, and I told him about King's claim to the engine, and that King was going to move it. I don't remember what he said. He said the engine wasn't any account anyway. The receiver never did tell me he would get me a good engine to pump the lease with. * * * I didn't live up to my contract with the receiver, because I was going to lose my engine, and I was waiting to see if we would get an engine some way or other. I knew at the time I took the engine it was a rented engine, and knew it was in a lawsuit, and I knew what kind of engine it was before I took the contract."

J. S. Dickey testified for the defendant that since they started operations on the lease in question they had received something like $900 for their part of the oil runs. That the defendant had executed a note to W. B. Worsham & Company Bank for $1,500, and in addition to that he and Mr. Neville and Mr. Moore had put up about $2,000 more. That they had spent in round numbers on the lease in getting it in shape and operating it right about $5,000. That there never had been any demand made by the Midwest & Gulf Company that the defendant drill any wells on the lease. That only two references had been made by the plaintiff as to the drilling of another well. Mr. Weichel in a letter stated that he thought it would be a good idea, and his attorney stated to the defendants that the Midwest & Gulf Company had begun the drilling of another well to save further rentals, but that he found out that was untrue. That W. B. Worsham & Co. brought this receivership suit and were represented by Donley Suddath. That he did not know who drew up the judgment. That he thought that he (the witness) did, as he frequently drew judgments in which he was interested on the other side. That he was in favor of the receivership on account of the mismanagement. That Mr. Lynch was mismanaging the lease, and that he was not a practical driller. That Small is a very fine oil man, but Lynch is not, and Lynch would not give up and was not operating the lease in a way that it would make any money, and that all of them who composed the defendant wanted Lynch out, but he would not get out, and the purpose was to have a receiver appointed so the lease could be operated the most advantageously. That he admitted the lease had not been operated as it should have been. That the reason the receivership was had was because Lynch was not operating the lease skillfully. That they did not resist the receivership, as it was the proper thing to do.

[1] We think enough of the testimony has been quoted to sustain the finding of the jury that the defendant did not at all times use due diligence in operating the wells on the land in question. Mr. Dickey frankly

says in his testimony that, while Mr. Lynch, one of the defendant association, was on the lease, the wells were not being operated with due diligence. Lynch being a member of the defendant company, his failure to operate the wells with due diligence was the failure of the company itself. There is further evidence to sustain the contention of the plaintiff that, while the lease was under the management of the receiver, Hinkle did not use due diligence in operating it. It may be contended by the defendant that it is not responsible for any failure of operation while the receivership was in charge of the lease, yet the receivership was granted, if not at the instance of the defendant company, yet with the consent of several members of it, and by reason of an indebtedness incurred by the defendant company, while said company was in control of the lease, and evidently by reason of such control. Therefore we think that, in a measure the defendant was responsible for any failure of operation occurring during the pendency of the receivership.

We conclude that the sixth assignment of error must be overruled.

[2] Such conclusion requires an affirmance of the judgment below, even though the defendant company did use due diligence in cleaning out and putting the wells on the pump, and did use due diligence in putting all the wells on the pump that would make or produce oil, and did begin active operations for the development of the lease within five days from the date of the assignment from plaintiff to the defendant. We further find that any error in permitting J. W. Green to intervene, and in awarding judgment for said Green against the said company for the amount of his debt, interest, and attorney's fees, is harmless in so far as any controversy between the plaintiff and the defendant is concerned.

[3] It is urged in appellant's brief that it was not liable under the assignment from the plaintiff to it for any rentals due or supposed to be due W. L. Sewell by the plaintiff under the lease contract between Sewell and the plaintiff. We are inclined to think that this contention should be sustained. While ordinarily an assignee of a lease is liable for any rentals due thereon to the owner, even though the assignee does not specifically assume such obligation (Pierce-Fordyce Oil Ass'n, v. Woodrum (Tex. Civ. App.) 188 S. W. 245, yet we think the contract in the instant case was not an ordinary contract of assignment, but was a contract of operation, and merely provided that the defendant should be entitled to one-half of the production, after the royalty had been paid, for its services in developing and operating the lease, and that the contract was intended to convey, not one-half of the leasehold interest held by the defendant, but only to convey one-half of the production obtained,

after the original lessor's royalty had been paid. It is true that the instrument, in one paragraph, does convey a one-half interest in the "above-described property to party of the second part," yet, taking the contract as shown in the instrument as a whole, we believe that it was not intended to convey any interest in the lease itself, but merely an interest in the production. If such construction is justified, and we believe it is, the defendant would not be liable for the rentals which might be owing to Sewell from the plaintiff.

[4] Nor do we think any reversible error is shown in the charge of the trial court, as complained of in the sixteenth assignment of error. It appears that the court submitted issue No. 7, to wit:

"By the use of reasonable diligence, what amount of oil would such lease now produce? Answer by stating the amount in barrels per day."

That afterwards a pencil line was run through the word "reasonable" and the word "due" written above, and as thus corrected it was submitted to the jury. It is urged that the words "due" and "reasonable" were both plainly shown in the issue, and that such fact indicated to the jury that a higher degree of diligence than that of reasonable diligence was required of the defendant with reference to all of the issues where the word "due" diligence was used. It does not appear that the defendant, before the charge was given to the jury excepted to the giving of this issue with the words "reasonable" and "due" both clearly shown, in fact there is no exception to the charge by defendant shown in the transcript. In the absence of such objection to the charge, presented at a time when the court could have corrected the charge, and in the absence of a bill of exception thereto, we cannot tell the reason that impelled the court to overrule this ground shown in defendant's motion for a new trial. So far as the record discloses, it may be that the trial court found that the contention of defendant was not borne out by the facts. Moreover, we cannot say that the jury were likely misled by the use of the two words, as, in the sense used, the words are synonymous.

For the reasons stated, the judgment of the trial court is affirmed.

### On Motion for Rehearing.

Upon a further consideration of this case, at least a majority of the court conclude that we erred in affirming the judgment below.

[5] Forfeiture is a harsh remedy, and is not favored either in equity or in law. Courts are reluctant to declare and enforce a forfeiture if, by reasonable interpretation, it can be avoided. Forfeitures are enforced only where there is clearest evidence that such was meant by the stipulation of the parties.

6 R. C. L. p. 906, § 291. Before forfeiture can occur, there must be no question but that the parties intended to provide for it in the contract under which it is attempted to be enforced.

Believing, as expressed in the original opinion, that appellant was not liable for the rental provided for under the contract of lease between Sewell, and the appellee, and that the failure of appellant to pay one-half of such rental did not give rise to a ground of forfeiture of contract between appellant and appellee, we conclude that the only ground for rescission of such contract would be the failure of appellant to do the things contracted to be done. The jury found that the defendant below did not abandon the lease, and the question of abandonment is out of the case. They further found that the defendant began, within five days from the date of the assignment, actual operations for the development of the property, and that the lease did not produce enough oil over and above the reasonable cost of operation thereof to drill other wells.

[6, 7] The majority have concluded that appellant should not be charged with any negligence in the operation of the wells while they were in the hands of the receiver, especially since such negligence was not pleaded, nor was any request made for the submission of such issue. That, as a receiver is but a means of controlling and operating the property by the court itself, and since it is not shown in the evidence that appellant connived at or participated in any acts of claimed negligence on the part of the receiver, or the employés of the receiver, that the appellant should not be chargeable with such claimed negligence. The majority are further of the opinion that any negligence in the operation of the lease while Mr. Lynch was in active charge thereof does not afford ground for rescission or forfeiture, but at most would afford an action for damages. That, since it was apparent that Lynch was not operating the lease so that it would be profitable to appellee and appellant, appellant took steps to relieve Lynch of his duties, and that it appears from the testimony that appellant exercised reasonable diligence in cleaning out the wells at the beginning of the operations and in putting on the pump all of the wells which, in the exercise of reasonable prudence and judgment, appeared to be producing wells or capable of being made producing wells, and exercised reasonable diligence in the operation of the wells thereafter.

For the reasons stated in the original opinion, the writer is inclined to believe that the appellant is in a measure responsible for any negligence shown by the receiver or those in his employment, and he is further of the opinion that the appellant is distinctly responsible for any negligence in the operation of the lease while Lynch was in charge thereof. But he may be mistaken in these conclusions, and, in deference to the judgment of the majority, the judgment affirming the judgment below is set aside, and the judgment below is reversed and the cause remanded.