Mrs. Rose **TERBAY** et al., Appellants,

v.

**PAT CANION EXCAVATING COMPANY** et al., Appellees.

No. 11340.

Court of Civil Appeals of Texas.

Austin.

Nov. 17, 1965.

Rehearing Denied Dec. 8, 1965.

William B. Hilgers, Niemann & Babb, Larry Niemann, Austin, for appellants.

Meyers & Shannon, James R. Meyers, Austin, for appellees.

HUGHES, Justice.

This is a suit for damages arising out of a collision between a Ford dump truck being operated by Jimmy Lee Dooley, an employe of Pat Canion Excavating Company, a corporation, and a four door Chevrolet Sedan being operated by Joseph T. Terbay, Jr. The truck was owned by the Excavating Company and Dooley was engaged within the scope of his employment when the collision occurred. The sedan was owned by Mrs. Rose Terbay and her son, Joseph, was driving it with her permission.

The collision occurred about 12:30 p. m. November 8, 1963, in the 700 block on East Oltorf Street in the City of Austin, Texas. Joseph Terbay, Jr., received injuries in the collision from which he died on November 9, 1963. His mother, Mrs. Rose Mary Terbay, a widow, brings this suit against the Excavating Company and Mr. Dooley in her own behalf and as next friend of her minor daughter, Patricia Terbay. She is joined in the suit by her two sons, Samuel and Tommy Terbay.

It was undisputed that the dump truck was across the double yellow stripe and in the center lane where the Terbay car had the right to be when the cars collided.

Trial was to a jury which found (1) that the dump truck was not being operated at an excessive rate of speed, (2) that it was not negligence for the dump truck to be operating across the double yellow stripe (3) that the Terbay car was being operated at an excessive rate of speed and that this was negligence proximately causing the collision (4) that the failure of the operator of the Terbay car to turn his vehicle to the right was negligence proximately causing the collision (5) that the failure of the operator of the Terbay car to timely apply the brakes was negligence proximately causing the collision (6) the operator of the Terbay car did not fail to keep a proper lookout (7) the collision was not the result of an unavoidable accident.

We insert, for better understanding, a picture taken shortly after the collision which shows the position of the dump truck and car after they came to rest following

the collision. The Terbay car is headed in the direction it was traveling, east. The dump truck was going west. The pavement was wet and slick, and there was some mud on the street. The weather was misty and there was some rain at the time.

The dump truck was empty. It had just passed Travis Heights School. It was coming downgrade, a grade estimated to be between 10 and 15 degrees. The dump truck went out of control. We will quote some of the testimony regarding this movement of the dump truck.

The driver of the dump truck, Mr. Dooley, testified:

"Q Well, I am talking about the afternoon, right before the collision, as you were going westerly down East Oltorf, did you see any school signs at all?

A No, sir.

Q All right, sir. Can you tell us— help the jury any by telling them anything you saw right before this collision?

A I didn't see anything.

Q What was the weather out there? Was it raining that day?

A Yes, sir.

Q Was there sufficient mist or anything to keep you from seeing the signs, had they been there?

A Well, I know it was raining pretty reasonable—raining pretty hard.

Q Was your windshield wiper going?

A Yes, sir.

Q Do you wear glasses?

A No, sir.

Q Have you ever had any trouble with your eyes?

A No, sir.

Q Were you looking straight ahead?

A Yes, sir.

Q And as I understand you now, you didn't see anything?

A No, sir.

Q What is the first thing that you remember you can tell us about—after you entered East Oltorf, what is the next thing you saw or experience you had that you can tell this jury about between the time you got on East Oltorf and the time of the collision?

A The only thing that I remember is starting down the hill and I started sliding, and I was trying to get it, you know, back on my side of the road, and all at once I went—everything went black, and that is all I remember.

Q Do you have any idea how fast you were going?

A About twenty or twenty-five.

Q About twenty or twenty-five miles an hour?

A Yes, sir."

Mr. Dooley was familiar with this street and its condition as he had traveled it several times on the morning of November 8, 1963.

Mr. William L. Seals, who was riding in the right front seat of the Terbay car, testified:

"Q You say the truck was at the top of the hill when you first saw it?

A Well, I wouldn't say exactly at the top, but it was very close to the top. It was just coming down over it.

Q All right. Tell these ladies and gentlemen of the jury what you observed the truck do as it came towards you.

A Well, when I first noticed it, it sort of came into our lane, and then it went back into its own lane. And then J. T. says to me, he says, 'Hey, boy, look at that truck.' And then it seemed as if it was starting to come back in our lane again; then I turned to face the back.

Q You just turned around?

A Yeah, I turned around and bent over the front seat.

Q Well, why did you do that?

A Fear, I guess.

        *    *    *    *    *    *

Q With the street being wet, would you tell the jury what you observed about the water coming from the truck as it came down the hill?

A Well, it had a spray that was shooting over the top of the bed of his truck.

Q When you say the 'top of the bed' you mean clear up over the top of the dump truck?

A Yes, sir, from the back—the back part of it.

Q Did you see the truck just before it hit you?

A I can't say about just before, but I saw it as it slid over in our lane. I mean, I would say it was just before, because when I turned my back.

* * * * * *

Q Just before the impact did you see J. T. do anything,—the last thing you saw him do.

A He was turning the wheel to the right towards the curb.

Q Was he turning it visibly or just beginning to turn it? Just tell the jury what he was—

A He was turning it as you would normally turn a car—I mean nothing violently or anything; he was just turning it to get away from I guess you would call it the collision course.

Q All right. I take it, then—how long was it after you observed J. T. turning the wheel to the right that the impact—that the collision occurred?

A Two, maybe three, seconds. It seemed almost instantly.

* * * * * *

Q All right. And it was at that time, while it was about three or four blocks away, the truck was at the crest of the hill, just coming over the top of a hill?

A Just starting down.

Q Now, that is when you first saw it apparently out of control; is that correct?

A Yes, sir.

Q And then it swerved back and then back again, or do you know that?

A Well, it went in our lane and then over into its own lane and then back into our lane, and as it started back in our lane I turned around.

Q I see. But what I was saying, when you first noticed it it appeared to be out of control right up there where you first saw it?

A Yes, sir.

* * * * * *

Q Did you at any time prior to the collision, and not too long before, have any occasion to look at the speedometer of the Terbay automobile?

A Yes, sir, I did.

Q Can you give the Court any idea how fast J. T. was going just immediately prior to this collision?

A Between twenty and twenty-five.

Q I beg your pardon?

A Between twenty and twenty-five.

Q Miles an hour?

A Yes, sir."

This is all of the eyewitness testimony to the collision. Two expert witnesses testified, Police Officer Donny Neal Hicks and a Registered Professional Engineer, Mr. John A. Focht, Sr.

Mr. Hicks was with the Austin Police Department for four and one-half years. His rating was Patrolman No. 1 when he left the force. He was trained to investigate traffic accidents and had investigated 1058 major collisions. He investigated the collision involved here, arriving on the scene about fifteen minutes after it happened. Mr. Hicks testified in great detail about the condition of the street and the two cars as he found them. The 700 block of Oltorf Street was a 40 foot street, divided by four 10 foot lanes, and had a double center stripe. He testified about the skidmarks left by the dump truck and we quote such testimony:

"Q Would you please show on this diagram where those skidmarks are—describe the nature of the skidmarks at the various places along here—by that, I mean were they heavy in some places, .

and light in others—give us a description of what you found when you ran out the skidmarks that morning.

A Yes, sir. It commenced on the hill ten foot west of the school crossing sign sets of dual heavy skid, applied skid ran to a point of approximately, would be just about eighty foot, at which time the right wheels completely vanished. There was no picking any up; only picked up the left rear dual which—

Q The left rear what, again?

A The left rear wheels of the truck, dual wheels.

Q All right, sir.

A Which appeared that it was just more or less sliding more so than grabbing by brake action. At this point it appeared that he had fought it and touched his brakes again, and once again you get the dual sets of prints where it got back over on the westbound traffic lane, which that continued only for approximately twenty to twenty-five foot, and he swung back again on his left rear dual wheels, again which appeared to be more a rolling type of measurement completely down to this point and here—by the way, this is extremely light in this area and in this area.

Q Could you see it?

A Yes, sir. It was very difficult, but it was just a rolling—a rolling type of movement of the dual wheels.

Q All right, sir.

A And this part through here once again it was a broad sliding type of action, a side movement, the tires going in a side movement.

Q All right, sir.

A This was definitely broad skid where he had fought it and the back end of the truck had swung around, and

it had more the characteristics of a broad skid, sliding skid to this point here, where it appeared that the truck, the back end swung around. And then there was traceable skid to here where it was definite brake skid again at this point up to the impact itself, approximately 35 foot of definite, hard, braking skid.

Q All right. Officer, were you able to trace some of this wheel all the way back of these skidmarks?

A The left wheels only; right wheels, no, sir.

Q Is there any doubt in your mind that these were the wheels of the truck?

A No, sir, that was it.

Q All right, sir. Tell the jury and the Judge what was the total length of the skidmarks, beginning from the first heavy skidmark that you were able to trace, to the point of impact.

A The total combined skid, rolling and broad skid—broad skid, was 476 feet."

Mr. Hicks placed the left fender of Terbay car one to two feet from the double center stripe when the car was struck by the dump truck crossing the center stripe into the lane occupied by the Terbay car. The cars collided, according to Mr. Hicks, first by their respective right front fenders touching each other. After this initial contact, Mr. Hicks described the movement of the cars as pivoting and being circular in character.

The principal damage to the dump truck was sustained on its right side and about the center of the right front door.

When the cars came to rest after the collision they were about 38 feet east of the point of impact. In other words, the dump truck went backward, in direction, 38 feet after the impact even though it outweighed the Terbay car 7360 pounds to 3300 pounds. This fact made relevant the testimony of Mr. Focht, the engineer.

The substance of Mr. Focht's testimony was that, applying the laws of physics, considering the relative weights of the vehicles and other factors present, particularly the reverse movement of the dump truck following the collision, that if the dump truck was immobile at the time of impact, then the Terbay car must have been moving at the rate of 29.5 miles per hour, and that a speed of 4.2 miles per hour by the Terbay car was necessary, under the conditions assumed, to neutralize one mile per hour speed by the dump truck. The result of these calculations is that if the dump truck was moving at rate of 20 miles per hour at the time of impact, the Terbay car must have been traveling at the rate of 84 miles per hour in order to produce the backward movement of the dump truck.

Following the jury verdict, appellants filed a motion for new trial in which they produced two eyewitnesses to the collision who gave versions of the incident strongly calculated to overcome the devastating opinion testimony of Mr. Focht. Appellants sought vainly below and now seek here a new trial on the ground of newly discovered evidence.

The first of the two eyewitnesses was Donald C. Welch who is a school teacher at Travis High School. Mr. Welch recalled that, as he was turning out of the school parking lot (which is adjacent to Oltorf and about a quarter of a mile from the scene of the accident), he saw the dump truck pass directly in front of him going west at about 30 to 35 miles an hour. When he pulled on to Oltorf, there were two or three vehicles in between him and the dump truck. At the top of the hill near the blinking yellow light, he stated that the truck appeared to pick up speed and was traveling approximately 40 miles per hour. As the dump truck started to slide and swerve back and forth, he noticed the Chevrolet car coming from the west about 30 to 35 miles an hour. He watched the two vehicles as they traveled toward each other until the moment immediately prior to actual impact, at which time Welch diverted his attention to take care of his own braking and sliding.

Welch did observe the vehicles long enough to state that the speeds of both vehicles immediately prior to impact were approximately 15 to 25 miles an hour and the dump truck seemed to be going faster than the automobile immediately prior to the impact. Also, Welch said that it looked to him like the car was trying to get out of the way by turning to the right.

The other eyewitness, Jay Hart, was a student at Travis High School who testified that he was walking west toward Congress and was at the southeast corner of the intersection just west of the collision when he heard a rumbling sound and brakes screaming in back of him. He saw that the dump truck was sliding down the hill, fishtailing back and forth from side to side, and crossing the center line. At about the same time he noticed the Terbay automobile passing in front of him and heard a real hard thump and observed that the back tires sort of jumped up and down and the back end of the Terbay car swayed back and forth. It looked to him like the automobile was heading toward the right-hand curb.

It was also his testimony that the dump truck was going approximately 40 miles an hour plus when first seen by him, and that the automobile was going about 30 m. p. h. Also, it appeared to him that at the time of the impact the car was going about 20 m. p. h. and the dump truck was going about 20 to 25, a little faster than the car.

The relevancy and importance of the testimony of the witnesses is apparent. It would certainly soften the effect of the opinion testimony of Mr. Focht as to the speed of the cars at the time of impact.

The trial court made these findings pertaining to appellants' motion for a new trial:

"1) That prior to trial and judgment in this case, neither plaintiffs nor their

counsel had knowledge of two eye-witnesses to the accident, Donald C. Welch and Jay Hart, who testified at the hearing on plaintiffs' amended motion for new trial.

2) That Plaintiffs' counsel made a reasonable investigation of said case prior to trial and exercised ordinary diligence in their discovery efforts prior to trial, but the Court finds that the same efforts which discovered the witnesses after trial would have discovered them before trial."

■ We are of the opinion that these findings are supported by the evidence and that they entitled appellants to a new trial and that the trial court abused his discretion in not granting it.

Before the trial it appears that appellants, in attempting to find eyewitnesses to the collision, examined police records, interviewed investigating officers, examined records of the District Attorney who was considering criminal charges in the matter, interviewed the passenger in the Terbay car and the ambulance driver who drove Mr. Terbay to the hospital. Members of the Terbay family were sent to interview persons living in the vicinity of the collision. Photographs taken by the police at the scene were examined. One person identified in these photographs was identified and interviewed. None of these efforts resulted in finding eyewitnesses to the collision.

After the trial appellants made these prodigious efforts which resulted in the discovery of the witnesses Welch and Hart. An investigator, David Kuperman, spent four and one-half days going from shop to shop and house to house, talking to everyone he encountered. He talked with between 60 and 65 people and conducted about 100 interviews before finding a person who could tentatively identify a face in an Austin-Statesman photograph. Finally, after interviewing some persons twice and three times, Kuperman found a barber who

tentatively identified the witness Donald C. Welch by the use of a magnifying glass. Kuperman then tracked down Welch, interviewed him, and ascertained him to be an eyewitness to the collision.

The second eyewitness, Jay Hart, was discovered quite by accident. On the day before the hearing on the motion for a new trial, Welch mentioned to his class that he was going to testify in court on an accident which had occurred sometime earlier on Oltorf. Jay Hart spoke up and indicated that he had seen the accident too.

The opinion of Chief Justice Wheeler in Mitchell v. Bass, 26 Tex. 372, contains an eloquent and classic statement of the principles underlying the grant or refusal of new trials on the ground of newly discovered evidence. We quote from that opinion:

"In deciding upon motions for new trials on the ground of newly discovered evidence, courts have found it necessary to lay down stringent rules, and to scrutinize such applications with much strictness, to prevent the mischiefs which would otherwise be produced. The losing party too often finds it an easy matter to obtain new evidence to supply former deficiencies. It is easy to claim the discovery of new evidence, when the claim is really unfounded, or the result of negligence in the first preparation; and it would be of dangerous consequence to the rights of parties and the safe administration of justice, for the courts to grant new trials to parties merely to correct their own error, when they discovered where they were deficient, and when the requisite industry and vigilance would have supplied the deficiency in time. Such motions are received with careful scrutiny, and are held to address themselves very much to the discretion of the court; and where the court has refused an application made upon this ground, the appellate court will not reverse, unless

it shall appear that the court below has not exercised its discretion according to the established rules of law. Yet, much as should be left to the discretion of the court, and reluctant as the appellate court may be to interfere with the exercise of that discretion, there are cases where the established rules of law and the principles of adjudged cases would be disregarded if a party was denied a new trial upon newly discovered evidence. *The party who brings himself within the principles of such cases is entitled to a new trial as a matter of right, unless it be in those cases where it is apparent to the court that the justice of the case has been attained.* Where there can be any doubt of the justice of the verdict, to refuse a new trial, when the party has really discovered new evidence of a conclusive tendency, would be against justice and precedent; and by new evidence is meant proof of some new and material fact in the case, which has come to light since the trial."

The Court, after discussing the nature of the new evidence there involved continued:

"We think it cannot be said that his failure to discover it before the trial was in consequence of any want of diligence on his part; for very great diligence appears to have been used in the search. If want of diligence can be imputed to the party in this case, it is difficult to conceive of a case where the requisite diligence could be shown.

\*   \*   \*   \*   \*   \*

*and we cannot perceive what more effort the party was required to make, unless we were to hold that he was required, at all events, to have made the discovery, which he endeavored to make, but failed. That would be, in effect, to hold that this particular evidence could not come within the meaning of newly discovered evidence.* (Italics ours.)

\*   \*   \*   \*   \*   \*

The new evidence relates to the proof of a fact by means so dissimilar from that used upon the trial, as to afford no ground for treating it as cumulative merely of the evidence upon the trial. It is of so decisive a nature, so material to the just decision of the matter in controversy, that the defendant ought not to be denied the right to have it submitted to the consideration of the jury, unless his failure heretofore has been in consequence of his own fault, and we cannot perceive that it is. It is desirable that there should be an end of litigation with as little delay and expense as possible consistently with the great end of litigation, a correct decision of causes according to their real merits; but it should always be sought in subordination to the great end to be attained. Though there had been two trials, this was the only application for a new trial on the part of the defendant; he had been successful upon the first trial. We think a new trial ought to have been granted. And although we have felt some hesitancy in pronouncing the refusal of it to be error, yet when we consider the nature of the controversy, and of the new evidence, and the very material bearing it may have upon the just decision of the case, we are constrained to conclude that the refusal of the application was the denial of a right to which the defendant was entitled according to established rules of law governing such applications, and consequently that it must be regarded as error, for which the judgment will be reversed."

The degree of diligence requisite to a discovery of new evidence in the first instance is "due diligence." Texas Employers Ins. Association v. Moser, Tex. Civ.App., 152 S.W.2d 390, n. w. h., San Antonio, by Justice Norvell. Jacobi v. Texas State Board of Medical Examiners, Tex.Civ.App., 308 S.W.2d 261, Waco, writ ref., n. r. e. "Due diligence" is synonymous

with "reasonable diligence." Small-Lynch Co. v. Midwest and Gulf Co. of Texas Trust Estate, Tex.Civ.App., 269 S.W. 163, Fort Worth, n. w. h. It is also held that "due care," "due diligence" and "ordinary care" are convertible terms and mean the same thing. Western Union Telegraph Co. v. Smith, Tex.Civ.App., 133 S.W. 1062, Austin, n. w. h. In 66 C.J.S. New Trial § 104, p. 298, it is stated, "No matter how material the testimony may be, an applicant for a new trial on the ground of newly discovered evidence must have used ordinary diligence to discover and produce the evidence at the trial. Accordingly, in order to constitute such newly discovered evidence as will authorize a new trial, the evidence must be such as could not have been discovered before the trial by the exercise of reasonable diligence; and, where evidence was as available before trial as it was after the trial, a new trial is not justified. On the other hand, where movant, or his agent or attorney, used due diligence to discover newly discovered evidence before the trial ended, or where such diligence would have been unavailing, a new trial is warranted."

Appellee cites Employees Lloyds v. Schott, Tex.Civ.App., 183 S.W.2d 262, Dallas, writ ref., and Vance v. Obadal, Tex.Civ.App., 256 S.W.2d 139, El Paso, writ ref., as holding that diligence has not been exercised if the same diligence used to procure testimony subsequent to trial would have had the same result if exercised prior thereto. These cases do make these statements but it is obvious from a careful reading of the cases that the Courts are speaking with reference to the failure of movant to use the standard of diligence required to establish lack of fault in not earlier discovering the evidence.

In Obadal the Court stated:

"Nor does it seem possible to justify the point on the ground of newly dis-covered evidence. The evidence itself and its sources force us to the conclusion that it must have been available to all parties before the trial. As we understand the rule, movant must show that diligence was exercised to obtain the evidence and successfully negative lack of diligence. Reed v. Beheler, Tex.Civ.App., 198 S.W.2d 625; 31 Tex.Jur., Sec. 81 et seq.; 31 Tex.Jur., Sec. 84 et seq. It does not seem to us that appellant has met this burden placed upon him by the laws of our state."

In Schott the newly discovered evidence came from the neighbor of the injured em-ployee, the insurance company on motion for new trial contending that testimony of the neighbor that the employee conducted himself as a robust, healthy person was newly discovered evidence. In sustaining the action of the trial court in denying a motion for new trial, the Court stated:

"As reasons for not earlier inter-viewing the new witnesses living on same side of street, within some 200 feet, defense witness explained: 'I have always found in trying to check up on anyone you suspicion, if you get too close to them and get a friendly neighbor, they are going to tip them off and consequently they are going to lay low * * *.'

Our review of error in the ruling complained of merely extends to a de-termination of whether the trial court has abused its discretion in such re-gard. 31 Tex.Jur., page 90. A motion for new trial, on ground of newly dis-covered evidence, must be supported by a showing of proper diligence; in which connection the new evidence just outlined is seen to have been as ac-cessible to appellants before judgment as afterward. A new trial must be denied if the same diligence which dis-covered the evidence subsequent to the

trial would have discovered it prior thereto. 31 Tex.Jur., page 98. The trial court has impliedly found that, had appellants exercised reasonable diligence in making neighborhood inquiry, the evidence of Mr. and Mrs. Newcomb would have been forthcoming before the case was tried; and so viewing the testimony, adduced on appellants' motion for new trial, the court's denial thereof was well within its discretion; * * *."

In neither of these cases did the trial court find that prior to the trial the party seeking a new trial had exercised diligence, or ordinary diligence, in attempting to discover the evidence sought to be considered newly discovered evidence. Our situation here is just the reverse. The trial court found, and we approve its finding, that appellants did exercise ordinary diligence before trial to discover the evidence which they offered as newly discovered evidence on the motion for new trial.

We believe that the Court in Mitchell v. Bass, supra, stated principles which deny the construction which appellee seeks to place upon the two authorities above discussed in holding that a party seeking a new trial on the ground of newly discovered evidence was not "required, at all events, to have made the discovery, which he endeavored to make, but failed," for to hold otherwise "would be, in effect, to hold that this particular evidence could not come within the meaning of newly discovered evidence."

■ We are of the opinion that the finding of the trial court that appellants exercised "ordinary diligence" in their pretrial investigation of this case without discovering the witnesses Welch and Hart is the equivalent of a finding that they exercised due diligence. We affirm this finding, and having done so it is our opinion that appellants were entitled to a new trial as a matter of right unless it is apparent that justice in this case has been attained.

■ We are not of that opinion. We are of the opinion that upon re-trial, with the admission of the testimony of the witnesses Welch and Hart, that in all probability the result of the trial will be favorable to appellants.

If one will but look at the position of the two cars when they collided, and other factors, it will be apparent that justice has not been attained in this case.

The Terbay car was proceeding west, one or two feet inside the double yellow stripes. The dump truck was completely, or at least 99.9% in the lane rightfully occupied by the Terbay car. The dump truck was slanted toward the southwest. If the Terbay car had pulled to the right, it would have been in the direct path of the dump truck. It should also be borne in mind that the outside lane was only ten feet wide and that this is a very small area in which to maneuver and successfully dodge a wildly careening 3½ ton dump truck.

Perhaps Mr. Terbay should have stopped or slowed his car. Even so, this would have been no guarantee of safety. He did not know where or when the dump truck was going to zig or zag. If he had stopped or slowed and had been hit, it could no doubt be established that had he proceeded at full speed he would not have been hit.

There is no worthwhile evidence to sustain the jury finding that the Terbay car was, at the time of the collision, being operated at an excessive rate of speed.

There is no evidence that the dump truck was defective in any particular.

The failure of the driver of the dump truck to recall events up to the time of the collision, and that he "blacked out" before impact, is nigh incredible. In the event, the finding of the jury that it was not negligent for the dump truck to be in the wrong lane defies reasonable analysis or explanation.

In view of our holding that appellants were entitled to a new trial on the ground of newly discovered evidence and that justice has not been attained, we refrain from passing on their point that the verdict of the jury is against the great weight and preponderance of the evidence.

█ There is one remaining matter to be briefly discussed. Mr. Hicks, the police officer, offered to testify, from his experience and from his investigation of the physical facts found by him at the scene of the collision and immediately after its occurrence, that the dump truck was, at the time its brakes were first applied, traveling at the rate of at least, 45 miles per hour. This evidence was excluded on the ground that Mr. Hicks was not sufficiently qualified to express an opinion. We believe the court was correct in this ruling. While Mr. Hicks had considerable training in the proper manner of investigating car collisions and had had a great deal of experience in this field, he had no knowledge or experience qualifying him to estimate the speed of the cars from the amount of damage sustained by them, nor did he have any knowledge or experience which would qualify him to express an opinion as to the speed of the dump truck based on its skidmarks left on a steep down grade, wet, muddy and slick pavement.

The judgment of the trial court is reversed and this cause is remanded.

Reversed and remanded.

ARCHER, C. J., not participating.